151263 Douglas Dynamics, LLC v. Buyers Products Company Mr. Shunk. May it please the court. With the court's permission, I'd like to address three points this morning, subject, of course, to the questions that the court wants me to address. The first one that I would like to address is the effect of the very recent Teva v. Sando and Dow v. Nova decisions on the indefinite arguments that was made in the briefs. The second one is to discuss the argument by Douglas that essentially the entire market value rule is the default rather than being an exception to the way in which damages are calculated. And then the third point I'd like to turn to is the question of what the words of the district court in entering judgment were and what the effect of those words were in the case. Turning to the recent Teva and Dow cases, they were not cited in the briefing because they were decided after the briefing began. But both of them, I think, add strength to the indefiniteness argument that the appellant is making in this case. Both those opinions came out after your yellow brief was filed? I believe the Teva case was a few days before the yellow brief was filed, Your Honor. The Dow case definitely, the Dow case and the decision on denial of en banc rehearing came out after the yellow brief was filed. They both make it clear that evidence about the understanding of a person of ordinary skill is central to the question of indefiniteness now that we know from the Supreme Court in the Biosig case that simply the ability to reach a construction of a claim term is not enough to guarantee that that claim term is, in fact, definite. What if, hypothetically, that the intrinsic evidence of a patent resolves the question, or the court comes to the conclusion that that resolves the question? Then what role, if any, does extrinsic evidence have to play? Your Honor, that really wasn't the case here because the phrase support frame. It's a hypothetical, though. Maybe I disagree with that, so please answer the hypothetical. I think Your Honor is suggesting a situation where the intrinsic evidence is so clear that a person of ordinary skill couldn't disagree as to what the meaning of the phrase was. And in that kind of situation, then it wouldn't make any sense to put on additional evidence from experts about what they believe the claims mean. I think that it's a situation where the intrinsic evidence isn't conclusive, or helpful, or illuminating enough to reach an understanding of the claim terms that then there must be a turn to extrinsic evidence. So I guess a shorter answer to Your Honor's question is I can imagine some cases where the intrinsic evidence is clear, and there's no need to consider any extrinsic evidence. But that wasn't this case. In this case, the phrase support frame doesn't appear in the original application. It was added during a broadening reissue. And there is really nothing in the prosecution history of the reissue application that illuminates support frame other than the statement that it is a broadening reissue. And therefore, we have to assume support frame means something broader than lift frame. That's the only thing that the intrinsic evidence showed. Now, what did the extrinsic evidence show? There were only two pieces of extrinsic evidence offered. One was the testimony of the inventor who said he flat out couldn't say what support frame meant. He had no idea. And the second was the testimony of the plaintiffs, Douglas's expert, who said that he thought it was very broad. He said it's not that I think it's nebulous, but it could mean just about anything. It could support just about anything. And then he sort of jokingly referred to the fact that you could put a child seat on a frame, and then it would be a support frame because it was supporting a child seat in the context of a snowplow. I guess the testimony from those two individuals, neither of them were within the context of the disclosure and the actual patent. Those were more just questions about the phrase support frame and the abstract. And what the exercise has to be is, given the patent is an integrated legal document, you have to understand these claim terms within the context of the actual disclosure, the written description. Yes, Your Honor. But I mean, extrinsic evidence, by definition, doesn't appear in the prosecution history. And in this case, it was clear that these individuals were being asked the question because the defendant had argument, and the defendant was pursuing that very clearly in the deposition. This wasn't just an adventitious statement by either of these gentlemen. They were being asked, what does this phrase mean? And they were both obviously people in their school. They were being asked, what does this phrase mean in the context of this claim in view of the specification? Well, no, that would be a legal question. I'm not even sure that would be appropriate to ask. I guess the way I would phrase it would be, what do you understand this to mean in the context of your patent? And I believe that that was the question, not in those words, but that was the nature of the question that was put to the inventor. And clearly, that was the question put to the expert because he was opining on that very question. And so, Your Honor, we have a situation here where the only evidence that was before the court to help it make a decision about definiteness were statements by persons of ordinary skill in the art that were contrary to a finding of definiteness. The court then, nevertheless, and contrary to Nautilus, reached into the specific embodiment that is actually described in Dependent Claim 48 and said, well, since Dependent Claim 48 and the specific embodiment in the patent show headlamps on the support frame, and since headlamps, you don't want them to go up and down, then it must be that support frame can only be something that maintains a fixed relationship to the vehicle when it's attached. Well, to be fair, District Court appeared to do more than that. I mean, it seemed to do a very thorough inquiry into all of the specifications, citing various portions of it, and noting that, ultimately, the way the term support frame is used in Claim 45, and just the way it's located in the context, it's very comparable to the lift frame language in other claims, like Claim 1. And lift frame is then described throughout the specification in very particular ways. It's lifting load. It's supporting components. It's connected to A-frames and mounting frames. And through all of that, he concluded that the intrinsic evidence compels an understanding of support frame slash lift frame. Well, that was the argument. Actually, Judge Chen, the District Court didn't equate support frames and lift frames. He said that, in his view, support frame was broader than lift frame. And that's where the fundamental contradiction in the court's two definitions of lift frame comes, because at one point, the court says support frame is a broader category that includes lift frames. And then later on, he says, well, support frames, though, have to maintain a certain relationship to the vehicle, when it's clear that lift frames don't have to do that. And the proof that lift frames don't have to do that is the plow patent, which shows a lift frame that's lifting up the front of the plow. But it actually moves up and down. You're looking at the disclosure of the prior art. You need to look at the disclosure of the patent itself. The patent itself describes lift frame as having multiple attributes. One of them is, during the operation of the plow, it's in a fixed position. Yes, but isn't the implication of that that if support frame is broader, then support frame must do more than that? That was certainly what the district court found. And the district court didn't equate lift frames and support frames, but clearly found one to be a subset of the other. That was the problem that the district court had. Setting what the district court set aside and just looking at what support frame means in light of the specification, what do you make of the language in column 13, where they say that it would be desirable for the frame to be permanently fixed, and that it would be necessary for the headlights to be fixed for safe and efficient plowing of snow, suggesting then that in operation, the support frame or lift frame would have to be fixed? Well, Your Honor, that kind of language it would be preferable for, that sort of thing, is the kind of language that a patent prosecutor uses to set out a specific embodiment of the patent. What about necessary? I'm sorry? What about the language necessary? I understand what you're saying about desirable, but what about the language necessary? I think that that's following on. In other words, I think the patentee is saying, and if you were to practice that preferred embodiment, then it would be necessary that it maintain in the same position. I think that this entire part of the patent is discussing that specific embodiment. What about the summary? I mean, what the district court did was really relied on the language in column three, and said this is in the summary of the invention, and therefore, I understand this to mean that this is the invention. How do you respond to that language, which, again, talks about how the lift frame must remain fixed to the vehicle so that during plowing and stacking of snow? Well, I don't think there's a relationship. That it must remain fixed to the vehicle means that it has to stay connected to it. I don't think it means that it needs to stay in a fixed relationship to the vehicle. I'm sorry, I paraphrased. It says remain fixed relative to the vehicle. I'm just asking about the language that the district court relied on. It's at column three, lines 23 through 29, and I'm wondering why isn't that enough to support the district court's construction? Again, I think it's describing a specific embodiment. What about the fact that it's in the summary of the invention? In the what? Summary of the invention. Your Honor, I don't think that detracts from the fact that it's describing one of the embodiments in the invention. And in fact, the patentee's expert recognized that there were many things that might be supported by the support frame that wouldn't necessarily need to remain in a fixed relationship. He talked about, I believe, flags. He talked about, he actually jokingly talked about a child seat. None of those things seem that the district court was hung up on the fact that headlights can't go up and down, but headlights don't exhaust the possible things that might be affixed to a support frame. And so the general language about- Headlights are the only things that are in the specification, right? I mean, child restraining seats aren't in the specification. Flags aren't in the specification,  Well, of course, support frame isn't in the specification either. And so it's a little bit, that's why more has to be done to figure out, if we can, what support frame means. Your Honor, if I can briefly move on to one of the other points, because I see that my time is running down, and I do want to reserve a little bit of time to respond to the cross-appeal if necessary. And that is that I wanted to say, in addition, that the words of the district court were clear, that the district court found only direct infringement. And yet, there was only a case of indirect damages, indirect infringement damages put on. There was a fundamental mismatch between the type of damages that were put on and the specific kind of infringement that the court found. Now, the only way to resolve that is to, and this is the argument that Douglas makes, to say that this court, in the Douglas 1 opinion, must have ordered the court below to find direct infringement and ignore the all limitations rule. And yet, it's clear that that isn't what this court did. The court's opinion begins by saying that the parties make plows, plow attachments to be attached to vehicles, and quotes the language of the claim itself that So it's clear that this court understood that in order to award damages against buyers for the sale of the attachment, there would have to be proof of indirect infringement. And yet, the district court found only direct infringement because of a lack of any proof. In fact, a lack of any proof in the face of the district court actually telling the plaintiff that it had not presented any evidence and giving them an opportunity in the rebuttal case to put on some kind of evidence that would support indirect infringement, and the plaintiff choosing not to do that. That fundamental mismatch means that, at a minimum, this case needs to go back as the Embrex case sent its case back for a mismatch. Cross motions for summary judgment on infringement and non-infringement many, many years ago, right? Yes. And initially, the district court found granted non-infringement to you. Yes. But at that time, that was the time for all parties to put all their cards on the table, right? And we did, your honor. Identify any and all elements or rationales for why you don't infringe, and likewise for the other side, the other team, to explain all the reasons why you do infringe under whatever infringement theory they want to go with. And at that time, what you were pitching was the connected to language. Yes. But you didn't bring up the vehicle. Yes, we did, your honor. At page 19 in the yellow brief, I have a section that discusses why there was no waiver. And I would refer the court to that in detail. But in the short form answer is that in the papers responding to the set, first of all, Douglas admitted that its claim against us on those particular claims of the patent was for indirect infringement. And it admitted. We also have an additional problem. We have law of the case, don't we, where we have this court having already announced that there weren't any other arguments raised and that you, therefore, you directly infringe Claim 45. But the court didn't say that. The court said that the accused products infringe. That was the actual words of the opinion. That isn't saying that we directly infringe or that we indirectly infringe. It's saying that the accused products infringe. And the accused products, in the context of the all limitations rule, the accused products, it clearly refers to the plows when they're placed on a vehicle. That was the accused product, the plow placed on the vehicle. Because that's even what Douglas described the accused products to be in recognizing that their only claim against us here that would go to the actual sale of the product was an indirect infringement claim. So since that was clear below, it wasn't even disputed below. It came up to this court. It wasn't really argued to this court. But it was an obvious point that we don't sell cars. We don't sell trucks. The court did not specifically say that there was no, that there was direct infringement. It just talked about whether the products, when of the claim, that was an issue that Judge Connolly should have allowed us to take up when the case was sent back for remand. Just like the doctrine of equivalence was not waived by Exxon in the Exxon case that we cited. Is there any use for these snowplow assemblies other than mounting them on the front of a vehicle? No, Your Honor. OK. OK. Thank you. Thank you. At this very bittle time, Mr. Shunk, help me pronounce your name. Good morning, Your Honors. I am Aaron Olenichek, and I represent Douglas Dynamics. Proceed. May it please the court. Your Honors, I'd like to first address this issue of buyers trying to recast our recent trial on damages as a trial on infringement. There was no need to address any infringement issue at the most recent trial. That issue had, as you recognize, Judge Shen, been already decided by this court. The Douglas 1 mandate already ruled that the accused products meet every limitation of claims 45. Buyers' arguments on the truck limitation, on Sienter, on indirect infringement are incorrect. They're moot, and they're untimely. Buyers failed to argue non-infringement of the truck limitation at any point in the first appeal or on summary judgment before that appeal. And this court acknowledged that in the first Douglas decision. And I quote, buyers has not presented any other arguments against infringement of claim 45. Accordingly, this court finds that the accused products meet every limitation of claim 45 as properly construed. Therefore, this court directs the district court to enter summary judgment of infringement in favor of Douglas. And this is 717F3D at 1340. There's nothing about indirect or direct infringement. There's just the decision that this court found that the accused products meet every limitation. So buyers' decision not to raise these arguments in the first appeal was consistent with and dictated by its summary judgment positions in that first trial. Douglas moved for summary judgment of infringement, asserting that to the extent the entire assembly was used by an end user, buyers was nonetheless liable as an indirect infringer. In opposition, buyers only argued that the accused products did not have the A-frame directly connected to the support frame, a position that this court rejected on appeal. Douglas never acknowledged that there was no infringement based on sales by a buyer's products company. Now, in its briefing, buyers points to the drug appendix at 2860 and 61, but that doesn't discuss sales at all. What it explains is that in the course of a sale of a distributor, if a distributor mounts  would be direct infringement by buyer's products because the distributor is an agent of buyer's products. But this wasn't all factually developed because buyers did not dispute the indirect infringement facts until 2013. They didn't raise the Sientra issue until 2013. It was all too late for them to raise this. Now, Mr. Sharp referred to buyers' yellow brief. And what buyers does in their yellow brief is they resort to certain findings of fact at the first summary judgment. But that doesn't save the day. What those findings of fact say is that they don't contributorily infringe because they don't directly infringe. And I can refer the court to the joint appendix at 4202 to 07 for that argument. Buyers shouldn't be allowed a free pass. Seventh Circuit summary judgment law, which is controlling here, does not permit a movement to delay pointing out claim flaws in the plaintiff's prima facie case. And the site for that is CNN Corporation, B. Cain, 756 F3D 1024 at 1026, a recent Seventh Circuit case in 2014. Again, buyers should not be allowed a free pass on this. Buyers presented no evidence, no arguments on indirect infringement at the time it was supposed to brief it. The responses to all the findings on the 700 patent do not say anything about the Siento argument at all. Here, too, the Seventh Circuit law outlined in CNN, C&N Corporation, explains that vague statements in a statement of fact do not preserve arguments. And that's also at 1026, that case. So at the recent damages trial, infringement was a decided issue. Per the district court's February 13, 2014 order, the infringement arguments are moot in light of this court's ruling on infringement. And that's why the entire trial was dedicated to damages. And this fact that Mr. Schoen continues to raise that the district court reverted to the issue in the middle of trial and asked Douglas if it wanted to expand the trial did not change anything. And that's indicated by the post-trial order in the joint appendix at 13 to 14 and at our red briefing at page 32. Douglas didn't refuse or waive any ability to put on an indirect infringement at the 2014 trial. There was no problem that needed to be fixed. The district court already ruled on summary judgment that Douglas Dynamics was entitled to damages on all sales because all sales were infringements. In fact, if we look at the joint appendix and the discussion by the court on this issue, that's at 9751 to 52 and 9758 to 62, the court really didn't even understand what Byers was advocating at that point. Douglas explained to Byers that the standard it was advocating for indirect infringement, it's hooked to get this back into the case, was actually incorrect. The court then decided, the court then asked if we wanted to put on any evidence. We said it wasn't necessary. The court then, and we reserved our ability to address it in post-trial briefing. And that's exactly what happened. It was addressed in post-trial briefing and the court decided that it was all too late. And also, as the judges have noticed, the arguments are legally flawed. The arguments based on global tech are flawed because Byers knew about the 700 patent. There's ample evidence on that knowledge. And also because there are no non-infringing uses for the product. So intent may be inferred for contributory infringement if there are no non-infringing uses and that's the RICO versus Quanta computer case. Can I direct your attention to the construction of support frame? And specifically, my question is with the district court in requiring that the support frame be fixed relative to the vehicle. Why wasn't that improperly reading in limitations from the specification? It was not improper, well, it was not improper because the court was deciding what the claim language support frame means. It was asked by Byers to look at that claim language relative to the prior art. And in analyzing that language, it looked at the specification to understand what the language support frame means. And it understood, as you well noted Judge Stoll, that the summary of the invention indicates that the lift frame also recognizes being equivalent to the support frame. The district court, I'm sorry for interrupting you, but didn't the district court also just say, you know, I'm very familiar obviously with the patent, I've read the whole thing. So the district court also said that the term support frame is broad and it is. It's a broad term. Frame is something that one of ordinary skill in the art would certainly understand. But there's nothing in the claim that says fixed. There's nothing that suggests fixed. Why should we go to the specification to figure out what that word means when the word support frame is, you know, just something particularly in mechanical arts that is just not so hard to understand? Right. But I think as with any claim language where there is a dispute, and certainly the dispute here first raised by Byers is that the claim language is indefinite. And the court first determined that the claim language was not indefinite. And then in the context of looking at the claim language relative to the prior art, it said, well, does this prior art include a support frame? And particularly in reference to the Blau patent. And in addition to that language in the summary of the invention where it talks about being fixed to the patent, it also looked at the background of the patent. And there in the background, the patent explains that the types of assemblies of Blau are certainly different than the type of Blau being claimed in the patent. And that's at column one, lines 44 to 55. So the claims were not meant to cover something like the Blau bell crank assembly and the specification distinguishes it. And so the court looked at all of that intrinsic evidence and said, well, if the claims are not meant to cover something like Blau, then what does support frame mean? It also looked at the summary of invention and said, well, it says that it needs to be fixed to the vehicle. That's different than what Blau does. And- Does it have to be fixed to the vehicle? When I read this, I see the part you're referring to right below it. It talks about how it's important to have it fixed to the vehicle to stack the snow. Am I understanding that correct? I'm sorry, I didn't- Does it say that it's important that the frame be fixed to the vehicle in order to stack the snow or that the prior art doesn't teach this ability to stack the snow because of the lack of being fixed to the vehicle, relative to the vehicle? So yes, it's this idea that having a lift frame that is fixed to the vehicle allows for the leverage of the plow, the front of the plow blade to be lifted up higher and to stack the snow. And you don't get that same advantage without having this larger support frame or lift frame. And that's why this patent is so different than the Blau patent. Now, I would like to address a couple of points that Mr. Shank raised on the Dow chemical and the TIVA cases, two recent cases. It's Douglas' position that those recent cases do not in any way alter the Nautilus standard. The Nautilus standard is that for indefiniteness that the claims must be read in light of the specification and the prosecution history. And that if they fail to inform with reasonable certainty those skilled in the art about the scope of the invention, then they're invalid. Well, what TIVA said is, well, that needs to be reviewed for clear error. And what Dow said is, and particularly the in bond decision, the denial of the in bond decision for Dow, said that, yes, Nautilus is right. You can look at extrinsic evidence, but it's not absolutely necessary. And here, we believe that is the case. The specification seems to be quite clear that a support frame is exactly what it's claimed to be, something that provides the same qualities of the lift frame, but also is capable of supporting additional features such as light as explained in Claim 48. The idea that the testimony of Mr. Watson or of Dr. Garris somehow overrides the clarity provided by the intrinsic evidence was rejected by the district court. In fact, Dr. Garris did testify that the term was definable. And indeed, he said it was a broad term, but he had an entire declaration explaining that that claim language was definite. Is it your view that support frame is essentially the same as lift frame? I mean, the only thing described in the spec is lift frame. Correct. And it helps you if you tell me that support frame means the same thing as lift frame. If you tell me that, well, support frame can mean a lot of things, and maybe among those things that it can mean also is a lift frame as specifically described and explained in the specification. I think they're interchangeable. I think a lift frame and a support frame is interchangeable. I think the only difference is that you have in Claim 48, which is a dependent claim to Claim 45, the idea that the lights are supported on the support frame. So the- Isn't the lift frame- The lift frame- as supporting components such as lights, light fixtures? Absolutely, Your Honor. Yes. The headlamp is? Yes, and in fact- I still don't see any daylight between the two. And, Your Honor, I submit that there is very little, if any, daylight between the two. I would say lift frame and support frame are interchangeable. In fact, that's what this Court recognized in Douglas 1. This is at the Joint Appendix at 68-99, in the first Douglas decision at page five. What this Court said is that in the buyer's accused products the A-frame connects to the support frame, which in turn connects to the mounting frame, and then provides a figure in the opinion itself pointing to what the support frame is. And the support frame is, as you mentioned, exactly the same as the lift frame. Now, I would like to turn to one of our cross-appeal issues, and that is this issue of pre-judgment interest. The District Court did properly conclude that Douglas was entitled to pre-judgment interest, but the District Court erred by not awarding pre-judgment interest at the prime rate. And the reasoning for this, for their error, becomes clear through a Seventh Circuit case which governs this, and it's the matter of the oil spill by the Amoco Cadiz, 954 F2D 1279 at 1332. Why does the Seventh Circuit's law apply? Why doesn't this Court's law apply, since the District Court was looking at Section 284 in awarding pre-judgment interest? Well, I believe, Your Honor, that this Court has consistently looked to the law of the circuits when they are ascertaining what pre-judgment interest is, unless there is some departure from the pre-judgment, from the law of the regional circuit. Can you tell me a case that specifically says that? I cannot tell you a case that specifically says that, but I can tell you that the Seventh Circuit precedent that we rely on here is consistent with, for example, the Uniloyal B. Rudkin Wiley Corp case, 939 F2D at 1540, which says that, it says that the Court may award interest at or above the prime rate. Well, what about Datascope? I'm sorry? Datascope. What about Datascope, where this Court said that it was fine, not an abuse of discretion, for the District Court to award pre-judgment interest at the T-bill rate compounded annually, and didn't seem to look at all, I don't see anything in this decision, where this Court, in that case, looked to the law of the regional circuit to figure out how to award pre-judgment interest under 35 U.S.C. Section 284. Right, and it is our position that pre-judgment interest is governed by the law of the circuit, and I cannot point to you today to a specific case that is contrary to the case that you cite, but stating that there is no reason to look at the law of the regional circuit. But it is Douglas' position that the law of the regional circuit is what should control in pre-judgment, for the pre-judgment interest calculation. So point out the Bio-Rad decision. It's Bio-Rad v. Nicolet. That's another case where the pre-judgment interest, there's actually a good number of pre-judgment, my law clerk just sent me light, cases where the pre-judgment interest was compounded, all the determination of the pre-judgment interest and what to compound it at, and at what rate was left to the discretion of the district court without looking to the law of the regional circuit. Right, and there's also the, granted, Your Honor, there are a lot of cases out there that address the pre-judgment interest, and that give the district court deference to look at things, that give, and they give the other, they give courts of appeals certain abilities to look at this issue as well. But I will also refer, Your Honor, to Transmatic v. Gluten Industries, 180 F3D 1343, which is a 1999 fed circuit case, which says that the, it says that the regional circuit law does govern these issues. And if we look to the Amico-Cadiz case, which is the seminal case in the Seventh Circuit on pre-judgment interest, what that case says is that pre-judgment interest needs to be awarded at the prime rate or above. And the reasoning for that is because as, as a patent owner whose patents are infringed, Douglas became an involuntary creditor to buyers. They weren't investing money in buyers, they were, had money taken away from them as a result of this infringement. And because of this involuntary loan to buyers, it shouldn't, we shouldn't be looking at something like a T-bill rate, which is an investment type rate. We should be looking at the prime rate, which is something that's more akin to a loan. And this prime rate is what Douglas must pay either explicitly if it borrows money, or implicitly if it finances cash out of hand. And this idea that Douglas's damages award was somehow an investment in buyers and should only be awarded at a rate that it would have received if it had put all of that money into a T-bill rate seems to be very inconsistent with the Emiko Cadiz case, which certainly states that the prime rate is more accurate in this instance where there is an unsecured loan to a creditor. Was there another point you needed on cross appeal? The other point on cross appeal, Your Honor, is that the district court erred in setting post-verdict royalties for the 530 and 978 patents. In that instance, there was an ongoing royalty that was ordered in lieu of an injunction for that technology in between the first trial and the decision on the first appeal, which instituted our request for an injunction. So there was this time period where there was a compulsory license for two of the patents that were found to be infringed. And what happened was the court originally awarded that license rate at 6.225%. On post-judgment briefing, we advocated that that rate should be increased to $400 per unit. You say post-judgment, this is after the jury verdict? Yes, Your Honor, yes. And what the judge decided, what Judge Connolly decided to do was award it at $200, which is about a 7% rate, only slightly above the 6.225 rate. Our position is that this rate should be substantially higher at the $400 rate because the infringement must, because the ongoing royalty must compensate the patentee for relinquishing its right to exclude. But on these issues, Your Honor, when I was leading up to, you're saying that there was not substantial evidence to support the jury verdict? No, Your Honor, we're not saying that. There was substantial evidence to support the jury verdict. Then I'm not sure what you're asking us to do. What we're asking you to do on the ongoing royalty, so this is an issue that was first decided by this court in the first Douglas appeal, that the ongoing royalty that was awarded to Douglas was insufficient because of the methodology used by the court involving the 25% rule. We then went back and rebriefed it to the court, and the court came back with a rate that was substantially similar to the rate that this court rejected. And what we're asking this court to do is to reconsider the judge's decision to award the post-verdict royalties on the 530 and 978 patents at a rate that reflects this idea that buyers willfully infringe the patents after the first jury verdict. Okay, okay. Thank you, Your Honor. Any questions? No questions, okay. Thank you. We have some rebuttal time. Yeah, may it please the court, Judge Chin, you ask counsel whether he would, whether it was his view that lift frame and support frame were about the same thing, and seizing on the apparent answer that that might be a good thing to agree to, he agreed to it. I would, however, direct the court to the red brief at page 42, where Douglas says very clearly that while the term lift frame connotes a support frame that supports a lift, the term support frame carries no such connotation. Claim 45 uses the broader term support frame in lieu of the term lift frame. When construing support frame, the district court specifically referred to language in the summary of invention pertinent to the lift frame. So, and he says that during the prosecution of the broadening reissue, prosecution counsel explained that claim 45 is different from one because it defines a support frame in contrast to a lift frame. So, they made the statement in their brief and throughout the broadening reissue that, in fact, support frame was broader than lift frame. That has always been their position, and that's what creates the fundamental problem here. Addressing very quickly the issues on cross appeal, I wanted to say, first of all, that there really is no, the Seventh Circuit, even if the Seventh Circuit test applies, the Seventh Circuit doesn't say that there is a per se rule that you must always apply the market, I'm sorry, that you must always go to what you could get by, what you would have to pay for a loan for the money, but that the court can enter any number if it does a refined analysis. We made the argument that the refined analysis that was done by the court was adopting our expert's analysis, and there really is no response to why that isn't a refined analysis, other than the argument that I heard from counsel that, well, somehow there's a difference between a loan and an investment, and they should get the investment, they should get the benefit of an investment, or the benefit of a loan rather than an investment. But in fact, a loan and an investment are the same thing, right, that's how savings and loans work. If I loan you money, you agree to pay additional money back to me, and that's my investment, I invest the money in you, you give me the amount back. And the court was basically saying that was the position Douglas was in at the relevant time period. It was cash flush. It was investing money by essentially loaning it to its distributors, and otherwise investing it as it might in the money market of the time, because that's what its balance sheet showed. The court said it's only fair that that's the best that they get back, because that's all they've been hurt. To put them in the position that they would have been, had there been no infringement, simply required that they make back on their money the kind of interest that they would have made if they had been able to invest that money in a risk-free investment, and that is the Treasury bill rate. That's why the Treasury bill rate was appropriate. It was appropriate to the specific circumstances. We should look at them as investing in their competitor rather than giving a loan to their competitor? In this particular case, yes, that's true, Your Honor, but the cases, and Judge Stoll was referring to the Federal Circuit cases that adopt the Treasury bill rate, seem to see that kind of analysis as appropriate because of the requirement that this is not a punitive award. It shouldn't be a punitive award when you're awarding prejudgment interest. It should simply put you in the position that you would have been had there been no infringement, and the position they would have been in had there been no infringement is that they would have had some additional cash that they could have put into, for example, money market funds. That's why it was appropriate for Judge Connolly to adopt the prejudgment rate he did. Very quickly, on the other cross-appeal issue, the fact is that there were no ongoing royalties to be awarded in this case because all of the plows that were the subject of that award were actually manufactured before the jury verdict, and they were sold before the entry of final judgment in the case. They don't fit into that category of devices that would be made after judgment, and in lieu of an injunction, an ongoing royalty is paid. These sales were of the same variety as the sales that the jury awarded an amount for, and so it's appropriate that, frankly, the jury's $85 amount be applied to those plows. Now, Judge Connolly found $200. We didn't appeal and argue that it should have been only $85. Frankly, it merely is an economic matter, but to award a $400 rate instead of the $200 rate just has no basis. You can't even justify it by saying that, well, since it was post-verdict, there should be an enhancement of damages because it would be more than the three-times enhancement that the enhancement statute would have permitted. So Judge Connolly was correct, and he shouldn't be disturbed in his ongoing royalty analysis that was really just an award of money for plows that had been manufactured before the jury verdict came out. Any more questions? Any more questions? OK. Thank you. Thank you both. The case is taken under submission. That concludes this morning's argument of cases. All rise. The Honorable Court is adjourned until tomorrow morning. It's 10 o'clock AM.